**In re INTERPICTURES, INC.,[1] Interpictures Releasing Corp., Interpictures Licensing Corp., Debtors.**

**Bankruptcy Nos. 886–61827–260, 886–62079–260 and 886–62117–260.**

United States Bankruptcy Court, E.D. New York.

March 17, 1994.

B. Amini, Stoch Amini & Munves, P.C., New York City, for Eliezer Miller, putative president of Interpictures, Inc. (Miller).

A. Massis, pro se.

R. Rosen, Loeb & Loeb, New York City, for Creditor Credit Lyonnais Bank Nederland, N.V.

J. Sapir, White Plains, NY, the Chapter 7 Trustee (trustee).

K. Stefflre, Patterson, Belknap, Webb & Tyler, New York City, for E. Frey, the former Chapter 11 operating trustee.

1. For purposes of the Opinion, the word debtor when used means Interpictures, Inc. only.

## MEMORANDUM OF DECISION ON REMAND AND CLARIFICATION

FRANCIS G. CONRAD, Bankruptcy Judge.*

■ This matter[2] is before me on remand for clarification of my March 31, 1993 order that denied a motion[3] to have certain assets of the estate, which had been administered, abandoned to the debtor.

I will deny the motion again for the reasons that not to do so would violate §§ 554 and 105, and would be otherwise inequitable, immoral, unethical, and a mockery of the law I have sworn to uphold as a United States Bankruptcy Judge.

This soft-core pornography case has a long and anguished history that has tormented several bankruptcy judges and creditors involved in the case. A review of the many abuses perpetrated by Miller and his minions[4] is necessary to an understanding of my decision today.

The debtor was petitioned involuntarily into Chapter 7 bankruptcy on November 6, 1986, along with several related entities. Thus, it has passed its seventh anniversary, and what has been accomplished? It has seen four bankruptcy judges[5], three trustees[6], and one examiner. There have been over 18 appeals docketed, almost all denied or dismissed; several motions to withdraw the reference, all denied; and opposition, in the form of motions to reconsider, objections to orders, orders to show cause, recusal and withdrawal motions, to every adverse ruling against Miller and his minions.

In the initial stages of these cases, instead of appearing and testifying before Judge Parente, the first bankruptcy judge assigned to these cases, and providing evidence as to his claims, and instead of appealing Judge Parente's decisions, Miller commenced numerous proceedings, including judicial complaints,[7] in the Second Circuit, the District Court, and the Bankruptcy Court in which he attacked Judge Parente, sought his recusal, and alleged that Judge Parente was involved in a cover-up. Later, when an evidentiary hearing was held by Judge Parente on Miller's charges, Miller failed to present any evidence other than invective and venom that Judge Parente was covering-up fraud. Symptomatic of Miller's conduct, when asked to present his evidence, Miller showed his nonspecific mentalpathy with the following colloquy:

> Miller: In the procedure of law when I bring forth allegations it is the burden of proof that those upon who it has been alleged, they should come forth and have discovery ...

sonally appeared before me in the four years I have been responsible for the case.

---

* Sitting by special designation.

2. Our subject matter jurisdiction over this controversy arises under 28 U.S.C. § 1334(b) and the Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Eastern District of New York. This is a core matter under 28 U.S.C. §§ 157(b)(2)(A). This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P. 52, as made applicable to this proceeding by Fed. R.Bkrtcy.R. 7052.

3. The motion originally filed is not clear as to which debtor the creditors want the property abandoned to. This is a jointly administered case, and is not substantively consolidated. On this procedural defect alone the motion should be denied.

4. These are Max Munk, Sidney Greenwald, and Eliezer M. Grossman. I will have more to say about these individuals later. I note that none of these individuals, including Miller, have ever per-

5. Judge Parente retired, Judge Holland was removed, and Judge Duberstein recused himself. It came to me under an administrative order of then Chief Circuit Judge Oakes, entered on the docket 02/01/90. It was assigned to me because no other judge in the Eastern District of New York wanted anything to do with it.

6. One of the trustees, Frey, also investigated and thus functioned as an examiner.

7. The Court of Appeals barred Miller from filing any more judicial complaints. Yet, a week before the September, 1993 hearing on this remand, Max Munk, an individual who has never appeared before me, filed a judicial complaint against me. The complaint was about my treatment of Miller. The entire complaint was rubbage. The complaint was dismissed by the Chief Judge of the Second Circuit, and when Munk

Court: You are saying you bring the allegations and the other side has the burden of proving the allegations are false . . .

Court: Since you are not getting your way, you feel you are not being treated fairly.

Miller: No. It is the intention of the real creditors of this case to do so . . .

Court: Do you know what an order of the Court is, Mr. Miller?

Miller: I am saying to the Court again and again—

Court: Do you know what an Order of the Court is? Do you honor an Order of the Court?

Miller: I honor all orders of judicial authority, and I feel Your Honor has no judicial authority in directing me. . . . That is my contention. If you rule to the contrary I would please ask for stay and I will ask District Judge.

(and on to another matter about an alleged tape.)

Court: . . . Mr. Miller, you were directed, you were ordered to produce a tape.

Miller: That tape I have furthered to the United States Attorney's office.

Court: Was that my order that you send it to the United States Attorney?

Miller: Your order was that the tape be presented here . . . my understanding was that you ordered me to bring forth that tape. . . . I decided that since this tape has in its proof, which I feel is proof against the Trustee, and showing exactly what has been going on, that tape shouldn't be in the possession of this Court, but rather in the possession of the United States Attorney who has jurisdiction over this case.

Court: You disregard the orders of this Court and you do what you think is

correct, is that what you are saying? You are admitting—

Miller: I am not admitting anything.

(October 28, 1987 transcript of hearing before the Honorable C. Albert Parente, United States Bankruptcy Judge).

Judge Parente continued the evidentiary hearing. It was never completed because Miller failed to appear on the last two scheduled hearing dates.

Similarly, after Judge Duberstein began to preside over these cases, he likewise gave Miller every opportunity to gather and present evidence to support his claims. Judge Duberstein placed Miller in control of the debtors albeit with restrictions.[8] When the Chapter 11 trustee resigned, Judge Duberstein permitted Miller to inspect the former trustee's books and records. Judge Duberstein also appointed Jack Weisbaum, a partner of the accounting firm BDO Seidman, to act as the Examiner in these cases to investigate Miller's claims. When Miller claimed that bankruptcy crimes had been committed, Judge Duberstein referred Miller's complaint to the United States Attorney's Office. See, Judge Duberstein's letter docket entry at # 408. We know of no action taken by the U.S. Attorney.

Despite Judge Duberstein's extraordinary efforts to give Miller the opportunity to substantiate his claims, Miller still did not seek to prove his claims through documentary evidence or testimony under affirmation, but instead was bent on pursuing his own personal agenda rather than that of the debtors. As an example, Miller, as putative President of Interpictures made an application to have a $300,000,000 counterclaim that the debtors had brought against him and his company, Royal Class Securities, withdrawn.[9] See, Docket Entry for October 27, 1988 (Exhibit 5). Thereafter, Miller besieged Judge Duberstein with judicial complaints, and stay,

asked that the entire Circuit hear it, it was again dismissed.

**8.** Judge Duberstein would not allow Miller to control the debtor's checkbook. Instead, Judge Duberstein had to co-sign, every check with Miller. When this practice stopped, it was discovered that Miller was using the debtor's cash to pay for his personal matters. It took the Chapter 7

trustee, several orders of this Court, and many months to wrench the checkbook from Miller's clutches.

**9.** Royal Glass was represented by a law firm that Miller later wanted to retain as the debtor's counsel—a clear violation of § 327. I refused to retain the firm and Miller appealed. This ruling was affirmed.

recusal, and withdrawal of reference motions, alleging that Judge Duberstein had joined Judge Parente (and Judge Holland) [10] in a criminal conspiracy. Although Judge Duberstein had attempted to remain impartial towards Miller, who brought two complaints against him "filed with unfounded, calumnious attacks on [his] character," Judge Duberstein was eventually forced to recuse himself. Rather than rewrite history, I include Judge Duberstein's well-written words in his memorandum order on recusal.

> If I were merely to recuse myself as the Bankruptcy Judge in charge of these cases without stating anything further, I would do myself an undeserved injustice. For that reason, I set forth the following condensed saga of these cases which contains the major factors that lead me to my decision to recuse myself in these cases. After patiently enduring more than one and a half years of Eliezer Miller's unrelenting, unfounded attacks on me as a Judge, I am left with no alternative.

> On November 6, 1986 an involuntary petition in bankruptcy under Chapter 7 was filed against Interpictures, Inc., one of the debtors herein. On December 23, 1986 it converted its case by filing a petition for relief under Chapter 11. On December 16, 1986 one of its subsidiaries, Interpictures Releasing Corp. filed a petition for relief under Chapter 11, as did another subsidiary, Interpictures Licensing Corp. which filed its petition on December 23, 1986. All of these cases were procedurally consolidated and assigned to Honorable C. Albert Parente, Bankruptcy Judge.

> Mr. Eliezer Miller appeared before Judge Parente claiming to be a shareholder and creditor. Although his status as such was disputed, he participated early in the cases in the request by creditors for the appointment of an operating trustee for all of the debtors under § 1104 of the Bankruptcy Code. Judge Parente appointed Edward P. Frey, Esq. as trustee inasmuch as at that time the United States Trustee who presently appoints such trustees was not yet in effect. Commencing shortly thereafter, Mr. Miller appeared constantly before Judge Parente, criticized the trustee's performance of his duties, opposed relief sought by the trustee, made numerous motions which Judge Parente denied, and eventually appealed to the District Court on many occasions. This brought him before several of the District Court Judges of this District, namely Honorable Jack B. Weinstein, Honorable Mark A. Costantino, Honorable John R. Bartels, and Honorable Edward R. Korman.

> Upon Judge Parente's retirement these cases were reassigned to Honorable Marvin A. Holland, one of the bankruptcy judges of this court. Subsequently they were re-assigned to me on May 13, 1988. The first task which I undertook was to determine whether Mr. Miller is a party-in-interest since his status was the subject of great concern and had been attacked by others in these cases. At a hearing called by me for that purpose, I conducted an examination and found him to be a party-in-interest as a shareholder and creditor of the principal debtor.

> Shortly thereafter, in examining the files to familiarize myself with the proceedings, I learned that special meetings of the Boards of Directors of the debtor corporations had been called in March of 1987 by one of the directors who claimed to be the sole surviving director, for the purpose of electing new directors and officers in place of those who allegedly had resigned early in the cases. I also learned that new Boards were elected at the special meetings which included Mr. Miller as director and which thereupon elected him president of all three of the debtor corporations. I thereupon conducted a hearing on notice to all parties, including the former officers and directors. Notwithstanding their objections, I found that the new boards and the officers were properly elected. When the operating trustee resigned in September of 1988 I designated the debtors, represented by their new boards of directors, to be debtors-in-possession with Mr. Miller as their president. From that point on he has been the only officer and director of the debtors who has actively participated

---

**10.** Judge Holland was briefly in this case. But Judge Korman asked that he be removed.

in these cases. One of the former officers and director, Mr. Alex Massis, who has continually disputed the validity of Mr. Miller's election, has appeared before me from time to time, opposed to whatever Mr. Miller has sought.

In order to assist the debtors, by Mr. Miller, in their efforts to reorganize in Chapter 11, I authorized the United States Trustee, who was then officially acting in this District, *sua sponte*, to appoint an Examiner under § 1104 of the Code to conduct an examination of the debtors' affairs and financial condition. Mr. Jack Weisbaum, a certified public accountant experienced in bankruptcy matters was appointed and his firm, BDO Seidman was appointed to assist him. Upon the completion of their report, it was filed with this court, and copies were provided to all parties in interest including Mr. Miller. I also directed that a copy be furnished to the United States Attorney of this District, having previously authorized Mr. Miller to provide him with all information concerning alleged bankruptcy frauds which Mr. Miller claimed had been committed during the course of these cases. I also referred to the United States Attorney the final report and accounts of the former operating trustee, together with Mr. Miller's written response in which he accuses the trustee of committing bankruptcy crimes during his tenure as trustee.

As he had formerly done before Judge Parente and Judge Holland, Mr. Miller made several motions before me in his individual capacity *pro se*. On other occasions he appeared as an officer of the debtors in connection with motions made by them at which they were represented by counsel, Richard J. Kurtz, Esq. There had been strong opposition to Mr. Kurtz's retention as attorney for the debtors by the United States Trustee and Credit Lyonnais Bank, a major lien creditor, because prior to these bankruptcy cases, Mr. Kurtz had instituted a lawsuit against Interpictures, Inc. in the state court on behalf of Mr. Miller and one of his corporations in which Interpictures, Inc. asserted a $300,000,000 counterclaim against them. The objectants further argued that Mr. Kurtz

was disqualified because he had represented Mr. Miller personally in many hearings before Judge Parente. The objectants argued that by reason of such representations, Mr. Kurtz was not a "disinterested person" as required by the Bankruptcy Code, a condition to the employment of an attorney by a debtor-in-possession. Nevertheless, in order not to leave the debtors without counsel and to provide Mr. Miller the opportunity to prosecute his allegations of fraud, I authorized Mr. Kurtz to represent the debtors as special counsel not only in adversary proceedings in this court but also in a RICO action which he had instituted on behalf of all of the debtors in this District Court and which is pending before Honorable Edward R. Korman.

Although I also authorized the debtors-in-possession to retain another law firm as their general counsel to perform the remaining services required to assist them in their efforts to reorganize, when they withdrew a short time thereafter I permitted Mr. Kurtz to appear before me on the debtors' behalf in connection with motions brought by them at Mr. Miller's instance.

Regardless of my approval of the attorneys in spite of overwhelming objections, Mr. Miller was not satisfied to rely on them. He continued to bombard this court with applications and motions ostensibly in the names of the attorneys but which were obviously prepared by him. On other occasions he moved *pro se* as a "party-in-interest" where the relief he sought was that in which the debtors were the proper parties. On many occasions when I arranged my calendar to concentrate on certain motions, additional motions were invariably brought on by him for hearing on the same return date and time, effectually strangling my ability to properly manage my calendar. He was constantly apprised of the fact that the only way to make headway in these cases was to attack one issue at a time. He chose not to heed my suggestion. As a result, I would literally be flooded with motions usually brought on by order to show cause which he vigorously contended required immediate hearing

and disposition, which in reality were of no more urgency than the motions which were previously scheduled for that day.

Mr. Kurtz eventually withdrew as counsel on the ground that he was not familiar enough with the Bankruptcy Code and Rules to properly represent the debtors. I then gave the debtors, by Mr. Miller, sufficient time to retain new counsel. I extended such time further when he was unable to retain counsel within the given period. Recently an application made, not by the debtor, but by Mr. Kurtz, to retain a law firm as special counsel to him and the debtors was denied by me without prejudice to submit an application by the debtors for the retention by them of special counsel and for the retention of general counsel.

Without counsel these cases in the bankruptcy court as well as the RICO action in the District Court are going nowhere. Even with counsel of Mr. Miller's choice, these cases were and are stagnating. When the settlement of an adversary proceeding brought by the former officers of the debtors against Credit Lyonnais Bank was submitted to me for approval and was opposed by Mr. Miller, I refused to authorize the settlement as not being in the best interest of creditors and the debtors. Accordingly I directed Mr. Kurtz to go forward with the adversary proceedings by commencing pre-trial discovery. He failed to do so. I also directed him to conduct an examination of Mr. Frey, the former operating trustee, as demanded by Mr. Miller, and he likewise has not proceeded accordingly. A motion which Judge Korman directed be made before me in accordance with Bankruptcy Rule 9024 and FRCP 60(b) for relief from an order signed by Judge Parente was improperly drafted and after denying the motion without prejudice to renew, it remains undone. This is typical of many motions Mr. Miller has caused to be made in these cases which has left me no alternative but to deny with leave to renew because of bad draftsmanship and a general disregard for legal bases and standing.

Although years have passed since these cases were commenced, there is no vestige of a plan of reorganization in the horizon. Yet I have continually extended the debtors' time to propose a plan and have repeatedly refused to dismiss or convert these cases to Chapter 7 liquidation in order to give Mr. Miller an opportunity to reorganize the debtors.

Notwithstanding all of the above, Mr. Miller has made numerous motions to recuse me which I have steadfastly refused to grant. I have sincerely believed that my knowledge of bankruptcy law and my vast experience in Chapter 11 cases would be invaluable assistance in guiding him through the usual difficulties encountered in fashioning a meaningful plan of reorganization and its ultimate confirmation. Despite his continued attacks on me, I refused to deviate from my ever present dedication to be of help, and with infinite patience I have continued in my efforts to assist him. He has unsuccessfully moved before Judge Korman to withdraw these cases from me. Instead of making a new motion for such relief he now resorts to writing Judge Korman letters pleading for the withdrawal. He has filed with the Judicial Council of this Circuit two complaints against me, one of which was dismissed, as well as was his appeal from that dismissal. The other is awaiting decision. He is not a stranger to the Judicial Council. In the course of these cases he also filed similar complaints against Judge Parente, Judge Holland, and District Judge Honorable Mark A. Costantino. All complaints were dismissed.

He has taken appeals to the District Court from so many of my decisions that I can no longer keep track of them. In several appeals he himself appeared as the appellant where the proper parties to the appeals were the debtors.

His letters to Judge Korman complaining of my conduct and performance as a bankruptcy judge as well as his outlandish charges contained in his complaints to the Judicial Council are filled with unfounded, calumnious attacks on my character in which he has improperly and unjustifiably accused me of participating in covering-up bankruptcy crimes. His charges are

fraught with scurrilous, defamatory and libelous statements. His conduct in my court has bordered on the contemptuous. He is ungrateful for all I have done for him on behalf of the debtors, and as I have told him on several occasions, Shakespeare best described him when in quoting King Lear he said, "How sharper than a serpent's tooth it is to have a thankless child!"

It is my sincere belief that I have demonstrated my impartiality and my true concern for due process in the period of time these cases have been before me. However, his vile conduct and behavior lead me to be concerned that my impartiality may come into question in the future. As a matter of record, I believe that everything that I have done in these cases so far indicates that in trying to show my impartiality to Miller, I have if anything, supported his position wherever possible.

In light of all of the foregoing I conclude that no steps which I have undertaken on behalf of the debtors appear acceptable to Mr. Miller. I further find that all roadblocks to a judicious conclusion of these cases have been created by him. Under the circumstances I find it impossible to continue on as the bankruptcy judge in charge of these cases. Based on the foregoing, it is ORDERED, that I recuse myself from continuing as bankruptcy judge in charge of these cases, and it is further ORDERED, that the Clerk of the Court be and she hereby is directed to randomly re-assign these cases in accordance with the rules of this court.

Dated: Brooklyn, New York
January 3, 1990
/s/Conrad B. Duberstein
CONRAD B. DUBERSTEIN
CHIEF BANKRUPTCY JUDGE

On February 1, 1990, I was assigned the responsibility to preside over these cases. Immediately, I ordered the debtors (i.e., Miller) to appear on March 7, 1990 at a status conference on the cases and a pre-trial conference in connection with several adversary proceedings. Notwithstanding my express direction that the debtors appear at such conferences, neither Miller nor any other representative of the debtors appeared. See, Transcript of March 7, 1990 hearing before me. Based upon my reading of the file, I certified to the United States Attorney, my first such certification as a bankruptcy judge, the possibility of numerous violations of 18 U.S.C. §§ 152, 153, and 154, and 18 U.S.C. § 1621 by Miller. I have never received a response to my certification.

By order dated April 4, 1990, I adjourned the March 7 conferences to April 26, 1990. Thereafter, Miller, who has never personally appeared before me, made several motions, each in his individual capacity, to recuse me and to stay the bankruptcy proceedings pending the debtor's retention of new counsel. I denied the recusal motion and scheduled a hearing for April 26, 1990 on Miller's motion for stay.

Despite the fact that the conferences and Miller's own motion were scheduled for April 26, 1990, Miller did not appear, preventing me, for the second time, from conducting the necessary conferences originally scheduled for March 7, 1990. See, Transcript of April 26, 1990. I denied Miller's motion for stay because he did not appear to prosecute it. By order dated May 10, 1990, the conferences were rescheduled for June 28, 1990. On April 26, 1990 I also converted the case to a Chapter 7. This order was appealed by Miller and later affirmed.

During the period of time between the April 26 hearing and the June 28 hearing, rather than address substantive issues, Miller continued his assault on me by making various motions to stay the bankruptcy proceedings, to recuse me, and to stay my denial of his motion for a stay. By order dated May 15, 1990, I directed that, in addition to the conferences to be held on June 28, 1990, a hearing would take place to determine whether Miller should be sanctioned for his repetitive and baseless stay motions. I also entered an administrative order barring Miller from filing any orders to show cause without first presenting them in person or by mail to me because his actions were cluttering the docket and harassing the Clerk's office. After the administrative order was entered, Miller's minions filed numerous orders to show cause and other motions. Of

course, no one showed up to prosecute them, but many showed up to defend them; all at great expense to the various creditors and the waste of my time preparing to hear them.

Even though I directed Miller to appear at the June 28, 1990 hearing, Miller again failed to appear, and no other representative of the debtors appeared for the conferences scheduled for that date.[11] *See,* Transcript of June 28, 1990 hearing. By order dated July 18, 1990, I rescheduled the conferences for August 13, 1990. I also scheduled August 13 as the date on which another of Miller's motions, to stay the proceedings pending a determination of whether the former trustee had standing and whether the former trustee's attorneys had a conflict of interest, would be heard. I advised Miller through the record that if he did not appear to prosecute his motion, costs and sanctions would be imposed against him. Finally, I scheduled August 13 as the date on which a hearing would be held as to why Miller should not be held in contempt for failing to appear at the June 28, 1990 hearing.

Despite my orders and the pendency of his own motion, Miller continued to refuse to acknowledge my authority and did not attend the conferences or scheduled hearings. *See,* Transcript of August 13, 1990 hearing. Likewise, the Chapter 7 trustee, Jeffrey Sapir, Esq. advised me that he was not prepared to go forward with the filed adversary proceedings because Miller had failed to cooperate with him, including Miller's failure to appear at two scheduled § 341 meetings and to turn over to Mr. Sapir certain books and records. Mr. Sapir stated to the Court that he needed the debtors' books and records and Miller's testimony to prepare for the meeting.

Thereafter, by order dated April 2, 1991, the District Court ruled on several of my prior orders, including my denial of Miller's application to retain the law firm of Hill, Betts & Nash as special counsel. In its order, the District Court vacated my order and remanded the matter for reconsideration. The District Court directed me "to determine whether there is merit to the potential claims the special counsel would prosecute and to advise whether I would authorize expenditure of funds for that purpose."

Pursuant to the District Court's order, and on notice to all parties, I held a hearing on June 3, 1991 for the purpose of determining whether Miller's claims were meritorious and on what Miller based his claims. If Miller's claims rested merely on his amorphous beliefs and conclusory allegations, it would be an abuse of the judicial process to permit the claims from standing in the way of the closure of the estate. On the other hand, if the claims had merit, it would be an abuse of the bankruptcy process to deprive creditors of their collection because of Miller's behavior.

Notwithstanding my order that he personally appear to illuminate me as to the merits of his claims, Miller himself did not appear at the hearing. Only his attorney [12], Sean Stantion, Esq. appeared. Indeed, Miller's non-appearance was consistent with his prior practice of not appearing at other scheduled conferences before me or at § 341 creditors' meetings at which he was requested to provide evidence, testimonial and documentary, of the facts to support the claims. Outside the confines of the courtroom, Miller was claiming that his claims had substance; inside the courtroom, though, Miller's non-appearance and silence was telling. I noted in connection with the claim for the accounts receivable:

> The problem and this is the Court's perspective, we have tried to get Mr. Miller's attention to come into this case which is over a year and a half ago in January and he never ever appears.
>
> Because of him, now this is a 1986 case, because of him personally this case does not move along, so today now you [Stantion] are telling me you are still not ready to go ahead.

Nor do I believe the U.S. Trustee took any action on these matters.

11. While all this was going on, we learned that Miller was using the debtor's money to prosecute his own personal appeals—a clear violation of 18 U.S.C. § 153. We did not bother to write the United States Attorney because we never received a response to the earlier certification.

12. Mr. Stantion is one of many in a long line of attorneys who have appeared for Miller. *See,* Judge Duberstein's order, *supra.*

I am trying to give Mr. Miller what he has not been doing all along, I am trying to give him the opportunity. I have literally, I think, begged from this bench to ask him to appear. And to come in and tell us what's going on and he never shows up.

All I have is speculation, I read [the Examiner's] report and I am left with the sense that there is some merit to what he has to say [in connection with the receivables claim], except I can't go any further because he is the President. He was in charge of the corporation and he's the one that's making the allegations that $12 million[13] has disappeared. No one else has made that allegation.

(Transcript of June 3, 1991 hearing pp. 10, 11).

Similarly, in connection with the claim under the RICO statute, Miller's failure to appear at the June 3 hearing also precluded the trustee and myself from passing on the merits of the RICO claim. At the hearing, the trustee specifically requested a statement on the record from Miller so the trustee could assess the allegations set forth in the RICO complaint. Accordingly, I recessed the hearing to allow Miller's counsel to telephone Miller and receive assurances that Miller would appear at a hearing to be scheduled two weeks in the future. The following colloquy took place following the recess:

THE COURT: [Mr. Stantion], did you get a hold of your client?

MR. STANTION: I did, Your Honor.

THE COURT: Is he going to appear the 14th?

MR. STANTION: I cannot express to the Court accurately my level of frustration. Mr. Miller is, I believe, a Hasidic Jew, he will not agree to such a thing on the phone without consulting with the Rabbi, therefore he is not agreeing. The Court

will have to proceed then without his consent.

(June 3, 1991 Transcript p. 34 (Exhibit 12)).

Having no practical, economical, or alternative solutions to comply with the District Court's directive (because of Miller's lack of cooperation), I proposed, and the trustee concurred, to hold an auction at which any interested party could buy the RICO claim and thereby let the merit of the claim be assessed by the marketplace. The purpose of the auction was not just to "assess" the monetary value of the RICO claim or make a determination of its dollar value to the estate, but to use the auction as a device to determine whether the claim had merit. My reasoning was that if the RICO claim had the degree of merit ostensibly claimed by Miller and was not merely strike suit fodder, its sale at auction would yield substantial funds for the estate to the benefit of the creditors. I also ordered the auction of the accounts receivables as a means of quickly collecting money for the estate.

On August 6, 1991, the trustee held the auction, which was advertised. Miller, once again, was not personally present. No bids were made for either the RICO claim or the accounts receivables. Finding the claim and the receivables to be without value, I then directed the Chapter 7 trustee to dismiss the RICO claim[14] and not to proceed with any efforts to collect upon the accounts receivables. Thereafter, by order dated September 4, 1991, I found that, having held the auction at which no bids were elicited, the claims were administered and could not be abandoned to the debtors.

Later, the District Court ruled that, absent a hearing specifically addressing this issue, I could not deem the claims administered and not abandoned, and permitted Miller to move this Court for an order declaring that the assets had, in fact, been abandoned to the debtors. By order dated March 31, 1993, I denied Miller's motion in this regard. On

13. Miller claims there are $12 million in accounts receivables. At most there is $700–$900 thousand. The $12 million appears to stem from a questionable accounting practice of booking income before it is earned. The remaining receivables may be valid, but they are tied up in litigation all over the world and are now basical-ly uncollectible due to age and location. The delay in their collection is entirely Miller's fault.

14. I believe the RICO claim was dismissed in 1993. Thus, abandonment of the RICO claim is moot.

appeal, the District Court remanded the matter back to me for reconsideration as to whether additional grounds exist to not abandon the property. The District Court found me clearly erroneous in my holding, but made no findings to support that ruling. Thus, I now elaborate on my March 31, 1993 order.

From the beginning of modern bankruptcy law, the courts have uniformly held that a trustee's power to abandon property is discretionary. *See, e.g., First National Bank v. Lasater,* 196 U.S. 115, 118–19, 25 S.Ct. 206, 207–08, 49 L.Ed. 408 (1905); *In re K.C. Machine & Tool Co.,* 816 F.2d 238, 246 (6th Cir.1987). By adopting a policy of adherence to a trustee's decision, the courts have placed the burden of proving an abuse of discretion of the trustee's action or inaction on abandonment on the party seeking to make the trustee act. To be sure, as noted in *K.C. Machine & Tool Co., supra,* numerous cases decried the practice of keeping burdensome or valueless property in an estate in order to increase commissions. In enacting § 554, Congress gave creditors a procedure to eliminate valueless or burdensome property. But an order compelling abandonment is the exception, not the rule. Abandonment should be compelled in order to help the creditors by assuring some benefit in the administration of each asset. *K.C. Machine & Tool Co., supra,* 816 F.2d at 246. Congress appears to have codified a substantial body of Act case law when it enacted § 554. That case law is best described as: abandonment is in the discretion of the trustee, bounded only by that of the court. *Goger v. United States (In re Janmar, Inc.),* 4 B.R. 4 (Bkrtcy.N.D.Ga.1979).

*Janmar, supra,* also held that there is no duty to abandon unless administration would cause expense to the estate. This is exactly the situation here. We directed the trustee to test the waters to see if there was any value to the receivables or the RICO claim. A properly and notoriously advertised sale produced no bidding. The free market was not interested in buying these pigs in a poke. Indeed, two Federal Magistrate Judges have indicated the RICO action was without merit. I have reviewed the receivables. While there may be some value to some of the receivables, they are now so old and in many cases in foreign country litigation that they are virtually worthless. All of this "aging" can be laid at Miller's shoes. Like *Janmar,* creditors or parties in interest here want the trustee to abandon assets. But there is nothing to abandon. These intangibles are valueless, but not burdensome. They cause no expense to the estate. What is really happening here is that Miller and his minions don't want to pay for the privilege of pursuing what are patently overrated and old receivables and a RICO claim that is, in my view, the paradigmatic abuse of the statute. They choose not to vote with their money in the hope that the trustee will have to abandon the carcass in order for them to feed on the carrion for free.

Another test is whether the trustee abused his discretion not to abandon. The answer is clearly no. Though the assets have been shown to be valueless and of no burden to the estate, there is always the possibility that someone may make a payment on the receivables in the future. If that event should occur, which has happened in other estates, a closed case may be reopened to distribute money to its creditors.

On a more technical note, it is also clear that the intangible property has been fully administered by the trustee through his efforts to sell them. By his efforts to sell them, they have gone through what can be best described as a legal metamorphosis. Prior to the auction, they were intangibles with inchoate value. After the auction, they are intangibles with no value and fully administered; remaining tangible only as a laser line of ink in the trustee's final report that would account for his action. There is nothing to abandon here. *See,* § 554(d). *See also, Dallas Cabana Inc. v. Hyatt Corp.,* 441 F.2d 865 (5th Cir.1971) (fact that trustee had failed to file suit was insufficient to authorize holding that cause of action has been abandoned); *Binnick v. Avco Financial Services, Inc.,* 435 F.Supp. 359 (D.C.Neb.1977) (mere failure of trustee in bankruptcy to prosecute claim against creditor under Truth in Lending Act did not establish abandonment of

claim where trustee did not pursue claim, perhaps, out of belief that any recovery on Truth in Lending Act claim would be set off against debt owed by bankrupt to debtor); *Re Schiappacasse,* 40 Am.Bankr.NS 129 (F.Ref.D.C. Ohio 1939) (A claim of refund from a public utility is not abandoned by the trustee in bankruptcy where in the final report of the trustee certain claims of the bankrupt are stated to be uncollectible and burdensome.); *In re Aldrich's Estate,* 35 Cal.2d 20, 215 P.2d 724, 19 ALR2d 885 (1950) (mere failure of the trustee in bankruptcy to reduce to money the bankrupt's remainder interest in the testamentary trust does not amount to an abandonment of such asset of the bankrupt estate); *Solomon v. Federal Trust Co.,* 123 N.J.Eq. 265, 197 A. 243 (1938) (Where stock owned by one who later became a bankrupt was held by bank as collateral for a loan to the bankrupt and also for a larger loan to holding company, the latter representing an amount greater that the value of the stock, and the trustee in bankruptcy wrote the bank that he must either sell the stock or abandon it, and later the bank received a notice from the referee in bankruptcy of an application to sell or abandon certain assets of the bankrupt considered worthless, and at the date named in the notice an offer to buy the stock at a nominal sum was made by a third person and accepted, it was held that the stock was not abandoned by the trustee); *Warwick v. Meridian Hotel Co.,* 177 Miss. 611, 170 So. 820 (1936) (where a judgment creditor of a corporate bankrupt sought to recover from a husband and his wife, who owned all of the stock of the bankrupt concern, funds of the bankrupt unlawfully diverted by them to their own benefit, the facts alleged were held to show no abandonment of the claim by the trustee in bankruptcy. The court pointed out that there were no allegations that the property or claim question was onerous, that the trustee thought it to be such, that the trust knew of the existence of the claim, or that the trustee was afforded an opportunity to make any election whatsoever in the matter); *Peters v. Wallace,* 9 Ky.L.R. 215, 4 S.W. 914 (1887) (the mere fact that the assignee in bankruptcy declines to sue in ejectment for land of the bankrupt estate does not constitute abandonment of the land).

Finally, equity demands that these assets not be abandoned to Miller and his minions. A judge must exercise right reason and conscience. A judge is under a duty, within the limits of his or her powers of innovation to maintain a relation between law and morals, between the precepts of jurisprudence and those of reason and good conscience. *The Nature of the Judicial Process (The Judge's Legislator),* pp. 133–134, Benjamin N. Cardozo. The only immorality in this case would be not to do what one has to do when one has to do it.[15] Any delay here, any accusations of fraud and perjury, lay directly with Miller. Given the unconscionable delay, persecutorial zest, utter incompetence, and absolute refusal of Miller and his minions to comply with the law, it would be immoral, illegal, and against the good order of society to allow them to profit from their actions or to turn them loose to afflict others.

## CONCLUSION

Based on the foregoing, I find that the property is not burdensome to the estate, has no value, has been fully administered, the trustee reasonably exercised his discretion not to abandon it, and it would be immoral and inequitable to allow the property to be abandoned to Miller and his minions. Accordingly, I refuse to abandon the property to the movant. The motion is DENIED.

Counsel for the trustee is to settle an order.

---

**15.** A slightly different version of Jean Anoukh's *Becket* (1959).